## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| MARK E. KING, | ) | CASE NO. 3:16CV1184 |
| | ) | |
| Plaintiff, | ) | JUDGE JEFFREY HELMICK |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Mark King ("Plaintiff" or "King"), challenges the final decision of Defendant,

Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"), denying his

applications for Period of Disability ("POD") and Disability Insurance Benefits ("DIB"), under

Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court

has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United

States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report

and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that

the Commissioner's final decision be AFFIRMED.

### I.    PROCEDURAL HISTORY

In May 2012, King filed applications for POD and DIB, alleging a disability onset date of

August 3, 2003 and claiming he was disabled due to "fusion of C4-5 and C5-6 cervical disks"

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

and migraine headaches.  (Transcript ("Tr.") 12, 148.)  The applications were denied initially and upon reconsideration, and King requested a hearing before an administrative law judge ("ALJ"). (Tr. 12, 66-68, 74-76.)

On June 3, 2014, an ALJ held a hearing, during which King, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 25-46.)  On August 6, 2014, the ALJ issued a written decision finding King was not disabled.  (Tr. 12-19.)  The ALJ' s decision became final on March 18, 2016, when the Appeals Council declined further review.  (Tr. 1-3.)

On May 17, 2016, King filed his complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 9, 11.) King  asserts the following assignments of error:

> (1)  The Commissioner erred as a matter of law in finding that Mr. King can perform medium work, as the record is devoid of any assessments from any examining physicians supporting such a finding.
>
> (2)  The Commissioner erred as a matter of law in evaluating the medical opinions of record.

(Doc. No. 9.)

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

King was born in January 1965 and was forty-nine (49) years-old at the time of his administrative hearing, making him a "younger" person under social security regulations.  (Tr. 18.)  *See* 20 C.F.R. §§ 404.1563(c) & 416.963(c).  He has at least a high school education and is able to communicate in English.  (Tr. 18.)  He has past relevant work as a tow motor operator, call center representative, and assembler.  (Tr. 18, 36-38.)

**B.      Relevant Medical Evidence[2]**

**1.      Physical Impairments**

On August 5, 2003, King presented to the emergency department with complaints of right elbow pain.  (Tr. 247-248.)  He reported intermittent elbow pain over the past 4 to 5 years, stating his pain had been diagnosed as tendonitis and treated with steroid injections.  (*Id*.)  King stated the pain had been getting worse over the past several months, and "really increased over the past week."  (*Id*.)  He described it as constant and rated it a 7-8 on a scale of 10.  (*Id*.)  King also complained of "a little bit of numbness in all fingers," but denied weakness or cyanosis.  (*Id.*)

On examination, King exhibited tenderness to the right elbow with palpation, but full range of motion.  (*Id*.)  He also showed good strength in his arm, good distal sensation, and 2+ radial pulses.  (*Id*.)  The emergency physician diagnosed tendonitis and discharged King home on Naproxen and with a prescription for Tylenol with codeine.  (*Id*.)  Later that month, King underwent an x-ray of his right elbow, which was negative for significant arthritic changes, fracture, or dislocation, but did show a "tiny olecranon spur."  (Tr. 489.)

On August 13, 2003, King presented to Ryan D. Klinefelter, M.D., for evaluation and treatment of his right elbow pain.  (Tr. 271.)  He complained his right elbow had been locking intermittently over the past four or five years, with "some mild pain" and arm weakness.  (*Id*.)  On examination, Dr. Klinefelter noted as follows:

---

[2] As King is seeking POD and DIB only, it is undisputed that he must establish disability between his onset date of August 3, 2003 and his date last insured ("DLI") of March 31, 2007.  (Tr. 12, 14; Doc. No. 9 at 2; Doc. No. 11 at 9-10.)  Thus, the Court will primarily confine its discussion of the medical evidence to this time period.

3

> Mr. King is a pleasant 38 year old male, who appears in no distress. He walks without a limp.  There is no tenderness in his neck or back.  He has no abnormalities of the bilateral lower extremities or the left upper extremity. Focused examination of the right upper extremity demonstrates full, nontender range of motion in his shoulder, wrist and hand.  He is neurovascularly intact distally.  Focused examination of the elbow demonstrates no effusion.  He is tender to palpation over his lateral epicondyle. He does have full range of motion of flexion, extension or pronation and supination.  I do not detect any evidence of a mechanical block.  There is no evidence of instability.  He has negative Tinel's at the elbow.

(Tr. 271.)  Dr. Klinefelter diagnosed right elbow pain and found that "part of the exam is consistent with lateral epicondylitis but he is having a lot of locking."  (*Id*.)  He ordered an MRI of the right elbow, which King underwent on August 21, 2003.  (Tr. 271, 379.)  The MRI showed mild to moderate tendinosis and peritendinitis involving the common extensor tendon with a small, low-grade partial tear at the tendon origin.  (Tr. 379.)

King returned to Dr. Klinefelter on August 27, 2003 and reported his elbow was "not any better."  (Tr. 270.)  He also complained of low back pain, "which he says has been there a long time and does not appear to be improving at all."  (*Id*.)  On examination, King was "very tender" over his right lateral epicondyle, with pain with resistive wrist and third finger extension.  (*Id*.) He had mild tenderness over his radial tunnel, but a negative Tinel's and full range of motion. (*Id*.)  Dr. Klinefelter noted King was "nontender" over his lumbar spine but had some tenderness in his right paraspinal muscles.  (*Id*.)  King had full muscle strength in his right lower extremity, hip, knee, ankle, and plantar flexion, and a negative straight leg raise test.  (*Id*.)  Dr. Klinefelter diagnosed right lateral epicondylitis and lower back pain, and recommended a steroid injection to King's right elbow.  (*Id*.)  King agreed, and Dr.Klinefelter administered the injection that day. (*Id*.)

On December 19, 2003, King reported experiencing two to four days of relief from the

4

injection. (Tr. 270.)  He stated he "is still having a lot of pain along the lateral aspect of the right elbow but has also been having some pain in the same area on the left for the last couple of months."  (*Id*.)  Examination revealed tenderness over the right lateral epicondyle, and pain with resisted wrist extension.  (*Id*.)  Dr. Klinefelter noted full range of motion, and no radial tunnel tenderness or instability.  (*Id*.)  Examination of King's left elbow showed point tenderness over the lateral epicondyle with full range of motion, no evidence of instability, and a negative Tinel's over the ulnar nerve.  (*Id*.)  Dr. Klinefelter diagnosed bilateral lateral epicondylitis and recommended physical therapy.  (*Id*.)

King returned to Dr. Klinefelter on January 28, 2004.  (Tr. 269.)  He stated physical therapy helped on the left side but "is not helping at all on the right side, and his elbow hurts just as much as ever."  (*Id*.)  King reported that "at this point, his right elbow hurts almost any time he is doing type of activity involving lifting" and "interferes with his activities of daily living greatly."  (*Id*.)  On examination, Dr. Klinefelter noted full active range of motion on the right elbow with "extreme tenderness" over his lateral epicondyle and pain in that area with resisted wrist extension.  (*Id*.)  Dr. Klinefelter discussed the possibility of surgical intervention.  (*Id*.)

On February 18, 2004, King reported he was "still having severe pain along the lateral aspect of his right elbow that is worse with any type of activity."  (*Id*.)  After discussing his options with Dr. Klinefelter, King elected to undergo right lateral epicondyle release surgery. (*Id*.)  He underwent the procedure on February 19, 2004.  (Tr. 272-273.)

King returned to Dr. Klinefelter one week after his surgery, on February 25, 2004.  (Tr. 268.)  He stated "he is just having mild pain and rarely needs any pain medication."  (*Id*.)  King also reported wearing a splint and working on his finger motion.  (*Id*.)  On March 10, 2004, three

5

weeks after surgery, King stated "he is doing very well and just having a slight amount of pain." (*Id*.)  He reported working on his range of motion exercises, but not doing any lifting with his right arm.  (*Id.*)  On examination, Dr. Klinefelter noted some mild swelling in the area of the incision but no erythema; a "trace amount of tenderness;" and "very little discomfort with resisted wrist extension."  (*Id.*)  Dr. Klinefelter encouraged King to work on his range of motion, but advised him to avoid lifting anything more than five pounds or engaging in repetitive wrist extension activities.  (*Id*.)

On April 7, 2004, King returned to Dr. Klinefelter, stating "overall is doing relatively well and just occasionally has some discomfort in the elbow."  (Tr. 633.)  He reported "doing a little more and thinks the pain is becoming a little more frequent."  (*Id*.)  On examination, Dr. Klinefelter noted "very mild tenderness" over his lateral epicondyle; full range of motion in his elbow; and no pain with resisted wrist extension.  (*Id*.)  Dr. Klinefelter advised King to "restrict his activities with [his right] arm as much as possible."  (*Id*.)  Thereafter, on April 26, 2004, King called to complain about elbow pain.  (*Id*.)  Dr. Klinefelter prescribed Ultracet.  (*Id*.)

On June 9, 2004, King reported "doing okay but still has some pain along the lateral aspect of his elbow especially when he tries to lift or do any type of heavy activity."  (Tr. 634.)  Examination revealed full range of motion, no instability, and "some mild tenderness over [King's] lateral epicondyle and this is just very mild with resisted wrist extension."  (*Id*.)  Dr. Klinefelter recommended physical therapy, and advised King to avoid "heavy aggravating type of activity."  (*Id*.)

Six months later, on January 26, 2005, King presented to the emergency department with complaints of neck pain and occipital headache.  (Tr. 207-209.)  He stated "this started initially

with a stiff and sore neck about 4 days ago, and then 3 days ago, he awoke with a headache."

(Tr. 207.)  King described the pain as constant, and complained of slightly blurred vision,

weakness, right upper quadrant pain for the past several months, and increased lethargy.  (*Id*.)

Examination revealed mild tenderness to palpation in the posterior neck, and pain with neck

movements "in just about every direction, particularly turning his head to the right."  (Tr. 207-

208.)  The emergency physician, Lawrence Lewis, M.D., also noted no edema, normal gait, and

no focal motor neurologic signs.  (Tr. 208.)

Imaging of King's cervical spine showed no evidence of fracture or subluxation, but did

reveal (1) mild narrowing of C4-C5 and C5-C6 interspace; (2) mild narrowing of the neural

foramina at C5-C6 bilaterally, slightly greater over the right than the left; and (3) minimal

narrowing of the right and left C4-C5 neural foramina.  (Tr. 204-205.)  Dr. Lewis interpreted this

imaging as showing "loss of the normal cervical lordosis which may indicate muscle spasm but

there is no prevertebral soft tissue swelling."  (Tr. 208.)  King also underwent a CT scan of his

brain, which was normal.  (Tr. 206, 208.)

King was diagnosed with neck muscle strain and right upper quadrant pain.  (Tr. 208.)

Dr. Lewis noted "some arthritic change on the C spine films but only minimal" and "no

definitive signs for cervical radiculopathy."  (Tr. 209.)  King was discharged with prescriptions

for Percocet and Norflex, and advised to limit his activity and follow up with his doctor.  (*Id*.)

On June 9, 2005, King returned to the emergency department after falling off a "mini-

motorcycle."  (Tr. 210-213.)  He reported he was riding a mini-motorcycle "when the motorcyle

sped up and he lost control of it," causing it to fall over onto his right ankle causing an abrasion

to the medial side.  (Tr. 210.)  King rated the pain an 8 on a scale of 10, and presented with a

7

"noticeable limp on ambulation." (*Id.*) Examination revealed abrasions to the right ankle, limited plantar and dorsiflexion range of motion to 75% of normal due to pain, and mild to moderate swelling with moderate ecchymosis to the area. (Tr. 211.) Emergency physician Michael Steger, M.D., diagnosed right ankle contusion and discharged King with prescriptions for Motrin and Percocet. (*Id.*) Imaging of King's right ankle showed moderate soft tissue swelling, and imaging of his right foot was normal. (Tr. 212-213.)

 On January 26, 2006, King presented to Khozema Rajkotwala, M.D., with complaints of insomnia and mood swings. (Tr. 240.) It appears Dr. Rajkotwala thereafter referred King to Bipin Desai, M.D., for a psychiatric evaluation.[3] (Tr. 233.)

On August 22, 2006, King returned to Dr. Rajkotwala reporting generalized aches and pains. (Tr. 241.) Two days later, Dr. Rajkotwala completed a form regarding King's impairments. (Tr. 236-238.) Dr. Rajkotwala identified diagnoses of sleep disorders, anxiety/stress, and bipolar, but declined to describe the nature and symptoms of King's condition or include an onset date. (Tr. 237.) When asked to provide any available consultative/diagnostic testing, Dr. Rajkotwala stated "From Dr. Desai (psychiatrist)." (*Id.*) He indicated King was treated with "medications only" and identified them as Seroquel and Lamictal. (Tr. 238.) Finally, Dr. Rajkotwala answered the final question on the form as follows:

> 10.     If the patient is an adult, please describe any limitations his/her
>         impairment(s) imposes on the ability to perform sustained work
>         activity. * * * If the impairment is physical in nature, please be
>         specific in regarding the ability to sit, stand, walk, bend, stoop, lift,
>         grasp, etc.  If the condition is psychological be specific regarding the
>         ability to concentrate, think clearly, communicate and relate with

---

[3] The medical evidence regarding King's psychiatric impairments are discussed in the next section, *infra*.

others, follow instructions, take care of personal needs and to function
independently.

ANSWER:      No physical limitation.

(Tr. 238.)

On October 29, 2006, King returned to the emergency department with complaints of

cough and chest pain.  (Tr. 256-258.)  He complained of a cough for the previous four days, as

well as a couple of episodes of "a very brief, sharp type" of chest pain.  (Tr. 256.)  King also

reported shortness of breath, chills and nausea.  (*Id*.)  He denied any extremity pain or swelling.

(Tr. 257.)  On examination, emergency physician Melissa Knarr, D.O., noted King's neck was

supple with no tenderness and swelling, and "full range of motion without Kernig or Brudzinski

sign."  (*Id*.)  She also noted no tenderness in King's back, no tenderness or swelling in his

extremities, full range of motion of all extremities, and good radial pulses bilaterally.  (*Id*.)  King

underwent a chest x-ray, which showed no acute process.  (Tr. 258.)

On March 9, 2007, King presented to pain management specialist Aleksey A. Prok,

M.D.,  for treatment and evaluation of his bilateral elbow pain.  (Tr. 259-264, 639-641.)  King

complained of an aching, burning pain in both elbows, rating it a 7 on a scale of 10.  (Tr. 639.)

He reported "problems with his elbows for approximately 6 years," and indicated surgery on his

right elbow "did not improve his pain."  (*Id*.)  He stated that "he likes to work with his hands but

5 minutes of working with the instruments will cause excruciating pain and he is unable to

function for the rest of the day."  (*Id*.)  King further indicated the pain affected his sleep,

appetite, physical activity, and emotions, and that "nothing so far makes him better."  (*Id*.)

On examination, Dr. Prok noted King had a well-healed scar on the lateral surface of his

right elbow, which was not tender to palpation.  (Tr. 640.)  He further stated "there is no

9

hypersensitivity though he has a small nodule beneath the skin," which was "very tender to palpation." (*Id*.) Dr. Prok also observed poor range of motion in his neck, but stated "range of motion in the neck does not produce pain." (*Id*.) King had good range of motion in his extremities, and his grip was 4/5 bilaterally. (*Id*.) Dr. Prok assessed elbow pain, prescribed ibuprofen, and referred him to orthopedist Aaron Fritz, D.O. (Tr. 641.)

The following medical evidence relates to King's condition after the expiration of his DLI. King presented to Dr. Fritz on April 12, 2007. (Tr. 384-385.) He reported continuing bilateral elbow pain, stating "when he works, it exacerbates or aggravates his condition." (Tr. 384.) King also described numbness radiating in the medial aspect of his elbow. (*Id*.) He had no gait disturbances and no difficulty with proprioception or buttoning his shirt. (*Id.*) Examination of King's right elbow revealed minimal tenderness, and full range of motion of the right elbow, wrist, hand and finger. (*Id*.) Femoral extension, resisted dorsiflexion of the wrist, and resisted palmar flexion produced pain; however, Dr. Fritz noted no instability or gross/motor deficits despite subjective complaints. (*Id*.) Dr. Fritz did remark that "elbow flexion test is positive and Tinel's of his ulnar nerve is positive and Tinel's and Phalen's are negative over carpal tunnel area." (*Id.*)

Examination of the left elbow revealed full range of motion to the left elbow, wrist, hand and finger. (Tr. 384.) Resisted dorsiflexion wrist reproduced moderate pain and resisted palmar flexion reproduced medial epicondylar pain. (*Id*.) No instability or sensory/motor deficits were noted despite subjective complaints but "Tinel's once again is positive over the ulnar nerve as his flexion test but negative Tinel's and Phalen's reproducing carpal tunnel syndrome." (*Id*.) Dr. Fritz diagnosed (1) lateral epicondylitis recurrent right elbow, (2) medial epicondylitis right

10

elbow, and (3) medial and lateral epicondylitis left elbow. (Tr. 385.) He recommended an EMG and nerve conduction studies, ordered blood work, and advised King to continue on his "current analgesics for pain management." (*Id.*)

King returned to Dr. Prok the following month, on May 3, 2007, with complaints of both low back and elbow pain. (Tr. 276.) He stated he was "getting more and more aggravated with the pain in his elbows because it limits his physical activity, and it limits his ability to hold job and function." (*Id.*) On examination, Dr. Prok noted full range of motion in King's neck, and pain with active and passive range of motion in his elbows. (*Id.*) Dr. Prok diagnosed elbow pain, prescribed Vicoprofen, and referred King for physical therapy. (*Id.*)

Later that month, on May 22, 2007, King presented to Samir Iskander, M.D., for evaluation and treatment of his bilateral elbow pain. (Tr. 406-407.) He complained of dull, achy, tingly pain in both elbows (greater on the right than the left), describing it as continuous and steady. (*Id.*) King stated "any use of the elbows and arms make it worse at the level of 8/10." (*Id.*) Dr. Iskander noted "a recent x-ray of the bilateral elbow showed that the patient has an evidence of metal anchor, status post surgical procedure on the right and evidence of lateral epicondylitis on the left." (*Id.*) On examination, Dr. Iskander noted muscle strength between 4-5/5 without focal deficit, a functional gait, functional range of motion for all his peripheral joints, and increased tenderness in his bilateral elbows with positive Tinel's sign on bilateral elbows on the right more than the left. (*Id.*) He diagnosed bilateral lateral and medial epicondylitis, and referred King for occupational therapy and comprehensive rehabilitation for his bilateral elbow problems. (Tr. 407.) Dr. Iskander also started King on prednisone as well as the use of tennis elbow bracing for his bilateral hands. (*Id.*)

11

On August 23, 2007, King returned to Dr. Prok, complaining of "pain 3-4/10 aching in the elbows." (Tr. 279.) He denied loss of strength and tone, but stated his elbow pain "limits his job abilities and limitations." (*Id.*) On examination, Dr. Prok noted good range of motion in King's neck without any radicular symptoms; 4/5 motor strength in his extremities; and no peripheral edema. (*Id.*) Dr. Prok assessed elbow pain and renewed King's Vicoprofen prescription. (*Id.*)

King returned to Dr. Prok in October and December 2007 with complaints of shoulder pain. (Tr. 282, 284.) In October 2007, King reported right shoulder pain, which he rated a 4 on a scale of 10. (Tr. 282.) He stated he had "been doing a lot housework and his pain may be attributed to physical activity." (*Id.*) On examination, King exhibited 4/5 muscle strength, and good range of motion in his right shoulder with "very little discomfort." (*Id.*) Dr. Prok also noted "some pain with extension laterally to the shoulder level which is similar to an impingement syndrome but he does not have other symptoms of impingement." (*Id.*) Dr. Prok assessed right shoulder pain. (*Id.*)

In December 2007, King complained of "dull and nagging pain in both shoulders." (Tr. 284.) King stated he was "very active," "continues to work full time," and "is doing well overall." (*Id.*) Dr. Prok felt King's shoulder pain might be the result of arthritis, and believed King might benefit from injections "but that is temporary relief." (*Id.*) He assessed shoulder pain and renewed King's prescription for Vicoprofen.[4] (*Id.*)

---

[4] King cites extensively to post-DLI medical records regarding his physical impairments. (Doc. No. 9 at 8-11.) The Court will not discuss these records in detail, but notes generally that they show worsening symptoms and pain in King's neck and lower back. For example, King cites a July 2010 MRI of his cervical spine showing disc bulges at C4-5 and C5-6, with mild narrowing of the thecal sac, facet arthropathy, and bilateral exit

### 2.      Mental Impairments

On February 3, 2006, King presented to Dr. Desai for a psychiatric evaluation.  (Tr. 233-234.)  He reported mood swings, insomnia, and irritability.  (*Id*.)  King explained that "for a week or two he'll be feeling really good, he'll have lots of energy, he'll have a decreased need for sleep, he'll be very productive, his thoughts will be racing and nothing can stop him," but then "for another couple of weeks he'll be depressed and won't even want to get out of bed."  (*Id*.)  On mental status examination, Dr. Desai noted King was cooperative and soft-spoken with depressed mood, blunted affect, average insight and judgment, and some anxiety.  (*Id*.)  Dr. Desai diagnosed bipolar disorder type 2 (rule out bipolar disorder type 1), and assessed a Global Assessment of Functioning[5] ("GAF") of 55, indicating moderate symptoms.  (*Id*.)  He prescribed

_____

foramina.  King emphasizes he underwent an anterior cervical diskectomy with fusion fixation C4-5 and C5-6 in August 2011.  He also notes a June 2012 MRI of his cervical spine showing foraminal narrowing at C3-4; disc bulge and bilateral foraminal narrowing due to osteophyte complex formation at C5-6; and disc bulge and diminished disc height at C6-7.  King states he was thereafter diagnosed with cerviogenic headaches, cervical postlaminectomy syndrome C4 to C6; and bilateral cervical radiculitis.  In January 2014, he was diagnosed with bilateral lumbosacral radiculitis secondary to multilevel degenerative disc disease with C2-3 greater than C1-2 disc bulges, lumbar spondylosis, post-laminectomy syndrome, status post C4 to C6 surgery with residual or recurrent disc osteophyte complex and neural foraminal stenosis.  King suggests this evidence is relevant because it demonstrates his headaches and arm/elbow pain are related to his neck and lower back problems.  While this post-DLI evidence may shed light on the cause of his headaches and elbow pain, however, King has not demonstrated it is relevant to the nature or scope of his physical functional limitations during the relevant time period; i.e., August 2003 to March 2007.

[5] The GAF scale reports a clinician's assessment of an individual's overall level of functioning.  An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments.  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  A recent update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice."  *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th

Lamictal and Seroquel, referred King to a therapist for anger management, and advised him "to follow up with Dr. Raj[kotwala] for all his physical ailments."  (*Id*.)

King returned to Dr. Desai several weeks later, at which time his wife stated "he's doing better" and is "less irritable."  (Tr. 232.)  King reported continuing difficulties with insomnia, and complained the Seroquel was not effective.  (*Id*.)  On examination, Dr. Desai noted King was cooperative with euthymic mood and affect.  (*Id*.)  He advised King to continue with Lamictal but switched him from Seroquel to Risperdal.  (*Id*.)  Dr. Desai again advised King to follow up with his therapist for anger management.  (*Id*.)

On May 9, 2006, however, King returned to Dr. Desai with a depressed mood and "vegetative symptoms of depression."  (Tr. 231.)  He stated he "rarely goes out of his home" and "doesn't like to be around people."  (*Id*.)  King indicated he was still having difficulties with irritability, and stopped taking Risperdal because "it wasn't helping."  (*Id*.)  King's wife stated "he's never been able to hold on to a job."  (*Id*.)  Dr. Desai increased his Lamictal dosage, switched him from Risperdal to Remeron, and again advised him to follow up with his therapist for anger management and CBT [i.e., cognitive behavioral therapy]."  (*Id*.)  Dr. Desai also instructed King to "follow up with Dr. Raj[kotwala] for all his physical ailments."  (*Id*.)

 King returned to Dr. Desai on June 8, 2006.  (Tr. 230.)  He stated he had stopped taking the Remeron because it made him "very irritable and dopey."  (*Id*.)  King's mood was depressed and anxious, with "some blunting of his affect."  (*Id*.)  He stated his irritability was better and his wife indicated King was "doing better except he's sleeping poorly at night."  (*Id*.)  Dr. Desai

---

ed., 2013).

14

advised King to continue with Lamictal, and prescribed Trazodone for insomnia.  (*Id.*)  He again advised King to follow up with Dr. Rajkotwala "for all his physical ailments."  (*Id.*)

On July 20, 2006, King returned to Dr. Desai and stated "he's feeling about the same." (Tr. 229.)  His mood was depressed and irritable, and "some paranoia" and a poor attention span were noted.  (*Id.*)  King indicated he "obtained no benefits from the Trazodone."  (*Id.*)  Dr. Desai continued the Lamictal, discontinued Trazodone, and placed him on Seroquel.  (*Id.*)

King returned to Dr. Desai on September 1, 2006.  (Tr. 242.)  He was "untidily dressed," unshaven, and depressed.  (*Id.*)  King reported his wife had left him and admitted to "vegetative symptoms of depression," as well as "difficulties with paranoia and irritability."  (*Id.*)  Dr. Desai increased his Seroquel dosage, advised him to continue with Lamictal, and "spoke to him about following up with a therapist but he was reluctant."  (*Id.*)

**C.      State Agency Reports**

**1.      Physical Impairments**

On January 14, 2013, state agency physician Olga Pylaeva, M.D., reviewed King's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment regarding the time period between King's onset date of August 2003 and his March 2007 DLI. (Tr. 61-62.)  Dr. Pylaeva found King could lift and carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk for about 6 hours in an 8 hour workday; and sit for about 6 hours in an 8 hour workday.  (*Id.*)  She concluded King had unlimited push/pull capacity, and no postural, manipulative, visual, communicative or environmental limitations.  (*Id.*)

**2.      Mental Impairments**

On September 5, 2012, state agency physician Caroline Lewin, Ph.D., reviewed King's

15

medical records and completed a Psychiatric Review Technique ("PRT") regarding the time

period between King's August 2003 onset date and his March 2007 DLI.  (Tr. 51-52.)  Dr. Lewin

determined there was "insufficient evidence to evaluate the severity of claimant's anxiety and

depression during the insured period."  (*Id*.)

On January 11, 2013, state agency physician Leslie Rudy, Ph.D., reviewed King's

medical records and completed a PRT regarding the relevant time period.  (Tr. 59-60.)  She

reached the same conclusion as Dr. Lewin; i.e., that there was "insufficient evidence to evaluate

the severity of claimant's anxiety and depression during the insured period."  (*Id*.)

**D.    Hearing Testimony**

During the June 3, 2014 hearing, the ALJ stated questioning would be limited to the time

period prior to King's DLI of March 31, 2007.  (Tr. 28-29.)  With that in mind, King testified to

the following:

- He worked as a sales representative at a call center, a tow motor operator, and an assembler of dryers at a Whirlpool facility.  (Tr. 29, 36-37.)

- His health started to deteriorate in 2001 when he began experiencing migraines. (Tr. 31.)  The pain would start in his neck and become so severe he would have to sleep for 8 to 12 hours.  (*Id*.)  On two occasions, he was treated at the emergency room for his migraines with IV medication.  (Tr. 32.)

- In August 2003, he lost all strength in his arms and hands.  (Tr. 30.)  He had surgery on his right elbow in February 2004.  (Tr. 32-34.)  Ultimately, it was determined that his elbow pain was linked to his neck pain.  (Tr. 32, 34-35.)

- Between 2003 and 2007, he had "terrible sleep habits." (Tr. 30.) He would sometimes go two to three days during which he was unable to sleep.  (*Id*.)  He tried various sleep aids but was unable to "get into a routine."  (*Id*.)  During this time period, he experienced a "drastic decline in [his] ability to do the smallest things, as far as mowing [his] yard or even driving."  (*Id*.)  There were times he would not leave his bedroom if he didn't have to.  (*Id*.)

- He saw a doctor for depression and bipolar disorder during this time period.

16

(Tr. 30-31.)  He was treated with various medications and sleep aids but they either did not work or they made him "feel like a zombie."  (*Id.*)

• After obtaining his GED, he started taking classes at a local college in 2000. (Tr. 33.)  He completed the first year of school, but then began missing classes due to his migraines.  (*Id.*)  He generally missed one to two classes per week. (Tr. 33-34.)  One week, he missed an entire week of school due to his migraines. (*Id.*)

The VE testified King had past work as a tow motor operator (medium, SVP 3); call center representative (sedentary, SVP 3); and assembler (light, SVP 2).  (Tr. 36-38.)  The ALJ then posed the following hypothetical question:

This first person is male, 48 years of age, same education and work background as Mr. King.  This person can lift, carry 50 pounds occasionally, 25 pounds frequently.  Can stand and walk six out of eight.  Can sit six out of eight. Occasional push, pull. Constant foot pedal.  Can frequently use a ramp or stairs, but never a ladder, rope or a scaffold.  Can constantly balance, frequently stoop, kneel, and crouch, but never crawl.

Manipulatives, visuals, and communication skills are all frequent.  This person should avoid dangerous machinery and unprotected heights.  Additionally, this person can do simple, routine tasks and tasks up to the SVP 3 level.  The tasks, however, should be low stress, no high production quotas, no piece rate work, no work involving arbitration, confrontation, negotiation, supervision, or commercial driving.  That's it.

(Tr. 38-39.)  The VE testified the hypothetical individual would be able to perform King's past work as an assembler, but would not be able to perform his past work as either a call center representative or tow motor operator.  (Tr. 39.)  The VE further explained the hypothetical individual would be able to perform other representative jobs in the economy, such as inspection worker (light, SVP 2); kitchen worker (medium, SVP 2); and laundry worker (medium, SVP 2). (Tr. 39-40.)

The ALJ then asked a second hypothetical that was the same as the first but changed the lift and carry restrictions to 20 pounds occasionally and 10 pounds frequently.  (Tr. 40.)  The VE

17

testified the hypothetical individual could perform representative jobs in the economy, such as bench assembler (light, SVP 2); packer (light, SVP 2); and inspection worker (light, SVP 2). (Tr. 41.)

King's counsel then asked a series of hypothetical questions.  First, counsel asked the VE to assume the ALJ's first hypothetical with the modification that the individual would be limited to occasional (as opposed to frequent) fine manipulation.  (Tr. 41-42.)  The VE's testimony is unclear, but it appears she testified such a limitation would preclude King's past work as an assembler as well as the previously identified jobs of inspection worker.  (Tr. 42.)  The VE did testify, however, that King would be able to perform other representative jobs in the economy such as the previously identified job of packer.  (*Id*.)

King's counsel then asked the VE to assume the ALJ's first hypothetical with the added limitation that the hypothetical individual would be unable to use his hands for 20% of the workday.  (Tr. 42-43.)  The VE testified such a limitation would preclude competitive employment.  (Tr. 43.)

Counsel then asked "if the hypothetical individual of No. 1 as it stood originally by the Judge, if they were to miss one day each week of work, would any competitive employment remain?"  (Tr. 43.)  The VE testified such a limitation would preclude competitive employment. (*Id*.)  Counsel then asked "if he were just missing two days a month, would that affect employment?"  (*Id*.)  The VE testified as follows: "I think that if that's a consistent pattern that person would have difficulty over time maintaining competitive employment," especially with unskilled or entry-level employment.  (*Id*.)

### III.    STANDARD FOR DISABILITY

18

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6ᵗʰ Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).   Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past

19

relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).

For the fifth and final step, even if the claimant's impairment does prevent him from doing his

past relevant work, if other work exists in the national economy that the claimant can perform,

the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, King was insured on his alleged disability onset date, August 3, 2003 and remained

insured through March 31, 2007, his DLI.  (Tr. 12.)  Therefore, in order to be entitled to POD

and DIB, King must establish a continuous twelve month period of disability commencing

between these dates.  Any discontinuity in the twelve month period precludes an entitlement to

benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d

191, 195 (6th Cir. 1967).

### IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.   Mr. King last met the insured status requirements of the Social Security Act on March 31, 2007.

2.   Mr. King did not engage in substantial gainful activity during the period from his alleged onset date of August 3, 2003 through his date last insured of March 31, 2007 (20 CFR 404.1571 et seq.)

3.   Through the date last insured, Mr. King had the following severe impairments: a disorder of the back and degenerative disk disease, migraine headaches, an affective disorder and an anxiety disorder (20 CFR 404.1520(c)).

4.   Through the date last insured, Mr. King did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.l520(d), 404.1525, and 404.1526).

5.   After careful consideration of the entire record, I find that, through the date last insured, Mr. King had the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c).  He can lift and carry 50

pounds occasionally and 25 pounds frequently.  He can walk and stand six hours each out of an 8 hour workday.  He can sit six hours out of an 8-hour workday.  He can occasionally push/pull and constant foot pedal.  He can frequently use a ramp or stairs, but never a ladder/rope/scaffold.  He can constantly balance, frequently stoop, kneel, and crouch, but never crawl.  His manipulative, visual and communication skills are frequent.  He should avoid dangerous machinery and unprotected heights.  He can do simple routine tasks and tasks up to the SVP 3 level.  The tasks should be low-stress, involve no high production or piece rate work or work involving arbitration, confrontation, negotiation, supervision, or commercial driving.

6.      Through the date last insured, Mr. King was capable of performing past relevant work as an assembler.  This work did not require the performance of work-related activities precluded by Mr. King's residual functional capacity (20 CFR 404.1565).

7.      Mr. King was not under a disability, as defined in the Social Security Act, at any time from August 3, 2003, the alleged onset date, through March 31, 2007, the date last insured (20 CFR 404.1520(f)).

(Tr. 12-19.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make

21

credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do

not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### Treating Physicians Drs. Rajkotwala and Arora

King argues the ALJ erred "in giving almost no weight to the medical opinions of [his] treating physicians, and showed a pattern of inconsistent standards when determining the weight given to the evidence provided."  (Doc. No. 9 at 18.)  He argues the ALJ improperly evaluated Dr. Rajkotwala's August 2006 opinion that King had "no physical limitations," arguing that "[a]t no point in this assessment did Dr. Rajkotwala attempt to diagnose or infer any physical disabilities to Mr. King and he clearly answered the questions based on mental disorders."  (*Id.*) King also asserts the ALJ erred in ignoring a letter written by Chander Arora, M.D., in April 2014.  (Tr. 568.)

The Commissioner argues the ALJ reasonably interpreted Dr. Rajkotwala's opinion as stating that King did not have any physical limitations.  (Doc. No. 11 at 8.)  She maintains (1) Dr. Rajtkowala was a primary care physician who had seen King for over ten years and monitored his physical ailments; (2) the form completed by Dr. Rajkotwala "contains absolutely no language suggesting that [he] was only to consider King's mental impairments," and (3) Dr.

23

Rajkotwala wrote "no physical limitation" on the form when prompted about all of King's

limitations.  With regard to Dr. Arora's April 2014 letter, the Commissioner argues it is not

relevant because "no reasonable reading of Dr. Arora's letter supports a finding that Dr. Arora

was opining on Plaintiff's condition during the relevant period."  (*Id.* at 9.)

A treating source opinion must be given "controlling weight" if such opinion (1) "is

well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2)

"is not inconsistent with the other substantial evidence in [the] case record."  *Smith v. Comm'r of*

*Soc. Sec.,* 482 F.3d 873, 877 (6th Cir. 2007); 20 C.F.R. § 404.1527(c)(2).  However, "a finding

that a treating source medical opinion . . . is inconsistent with the other substantial evidence in

the case record means only that the opinion is not entitled to 'controlling weight,' not that the

opinion should be rejected."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009)

(quoting Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece v. Barnhart*, 2006 WL 2271336

at * 4 (6th Cir. Aug. 8, 2006) (Even if not entitled to controlling weight, the opinion of a treating

physician is generally entitled to more weight than other medical opinions.)  Indeed, "[t]reating

source medical opinions are still entitled to deference and must be weighed using all of the

factors provided in 20 C.F.R. § 404.1527 and 416.927."  *Blakley*, 581 F.3d at 408.[6]

If the ALJ determines a treating source opinion is not entitled to controlling weight,

---

[6] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

"the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting Soc. Sec. Ruling 96-2p, 1996 SSR LEXIS 9 at * 5). *See also Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004)). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544. Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406. The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs*., 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383,

25

391 (6th Cir. 1984). According to 20 C.F.R. § 404.1527(d)(1), the Social Security

Commissioner makes the determination whether a claimant meets the statutory definition of

disability. This necessarily includes a review of all the medical findings and other evidence that

support a medical source's statement that one is disabled. "A statement by a medical source that

you are 'disabled' or 'unable to work' does not mean that we will determine that you are

disabled." *Id*. It is the Commissioner who must make the final decision on the ultimate issue of

disability. *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d

954, 958 n. 1 (11th Cir. 1982).

### *Dr. Rajkotwala*

On August 24, 2006, Dr. Rajkotwala[7] completed a form regarding King's impairments.

(Tr. 236-238.) Dr. Rajkotwala identified diagnoses of sleep disorders, anxiety/stress, and

bipolar, but declined to describe the nature and symptoms of King's condition or include an

onset date. (Tr. 237.) When asked to provide any available consultative/diagnostic testing, Dr.

Rajkotwala stated "From Dr. Desai (psychiatrist)." (*Id.*) He indicated King was treated with

"medications only" and identified them as Seroquel and Lamictal. (Tr. 238.) Finally, Dr.

Rajkotwala answered the final question on the form as follows:

---

[7] The parties do not dispute that Dr. Rajkotwala was King's primary care physician, and had been treating him since March 1996. (Doc. No. 9 at 11; Doc. No. 11 at 8; Tr. 237.) King, however, directs this Court's particular attention to only two treatment notes authored by Dr. Rajkotwala during the relevant time period. The first, dated January 26, 2006, indicates King presented to Dr. Rajkotwala with complaints of insomnia and mood swings, at which time Dr. Rajkotwala referred him to Dr. Desai for a psychiatric evaluation. (Tr. 233, 240.) The second treatment note, dated August 22, 2006, indicates King returned to Dr. Rajkotwala reporting generalized aches and pains. (Tr. 241.) In the absence of any argument to the contrary, the Court assumes for purposes of this Report & Recommendation that Dr. Rajkotwala was, in fact, King's treating physician at the time he authored his August 2006 opinion.

10.     If the patient is an adult, please describe any limitations his/her impairment(s) imposes on the ability to perform sustained work activity. * * * If the impairment is physical in nature, please be specific in regarding the ability to sit, stand, walk, bend, stoop, lift, grasp, etc.  If the condition is psychological be specific regarding the ability to concentrate, think clearly, communicate and relate with others, follow instructions, take care of personal needs and to function independently.

ANSWER:          No physical limitation.

(Tr. 238.)

After discussing the medical evidence at step four, the ALJ evaluated Dr. Rajkotwala's opinion as follows:

Turning to the opinion evidence, Mr. King's primary care physician Dr. Khozema Rajkotwala completed a form in August 2006 (Exhibit 3F: 4).  Dr. Rajkotwala indicated Mr. King had no physical limitations.  I give this assessment some weight, as it is supported by the medical evidence, including the treatment records.  However, based on the record as a whole, I find that additional limitations are warranted, which are included in the residual functional capacity assessed in this decision.

(Tr. 17.)

The Court finds the ALJ properly evaluated Dr. Rajkotwala's opinion.  King's arguments notwithstanding, it was not unreasonable for the ALJ to interpret Dr. Rajkotwala's statement that King had "no physical limitation" as meaning that Dr. Rajkotwala, in fact, believed King had no physical limitation.  Both parties agree Dr. Rajkotwala was King's primary care physician for over ten years.  There is nothing in the record to suggest he treated King solely for mental issues and, indeed, treatment notes indicate the opposite.  In August 2006, for example, King presented to Dr. Rajkotwala for treatment of physical issues; i.e., "generalized aches and pains."  (Tr. 241.)  Moreover, Dr. Desai's treatment notes clearly indicate Dr. Rajkotwala referred King to Dr. Desai for psychiatric treatment and evaluation (Tr. 233) and that

27

King should "follow up with Dr. Raj for all his physical ailments."  (Tr. 230, 231.)  Thus, it was reasonable for the ALJ to conclude that, when completing the questionnaire regarding King's impairments, Dr. Rajkotwala was fully aware of and competent to opine regarding his physical impairments and any resultant physical functional limitations.

Additionally, there is nothing on the questionnaire itself to suggest that Dr. Rajkotwala was being asked to opine solely regarding King's mental impairments.  The cover sheet to the questionnaire indicated King was seeking disability benefits due to both physical and mental impairments and, indeed, specifically requested that Dr. Rajkotwala consider both categories of impairments, as follows:

> Please submit a medical report or copies from existing office records to include:
>
> * History
>
> * Objective findings to include the most recent **physical**/mental status exam and clinical/lab tests.
>
> * Diagnosis/Prognosis/Treatment/Response to Treatment.
>
> * Work-related functional limitations: **the ability to sit, stand, walk, lift, carry, handle objects, hear, see, speak and travel.**  For mental impairments, describe the patient's capacity for understanding and memory, sustained concentration and persistence, social interaction and adaptation.

(Tr. 236) (emphasis added).

Moreover, the final question on the form expressly asked Dr. Rajkotwala to "describe any limitations his/her impairment(s) imposes on the ability to perform sustained work activity," noting "if the impairment is physical in nature, please be specific regarding the ability to sit, stand, walk, bend, stoop, lift, grasp, etc." (Tr. 238.)  In answer to this question, Dr. Rajkotwala stated "no physical limitation."  (*Id.*)  Under the circumstances, it was not unreasonable for the

28

ALJ to conclude that Dr. Rajkotwala meant exactly that.

Finally, even assuming the ALJ erred in failing to understand that Dr. Rajkotwala "answered the questions based on mental disorders," King does not explain how this would advance his cause.  Dr. Rajkotwala did not opine that King suffered from any specific mental functional limitations, much less any mental limitations that were not accounted for in the RFC.[8] Further, the ALJ only assigned "some weight" to Dr. Rajkotwala's opinion of no physical limitations, finding instead that additional limitations were warranted as reflected in the RFC. King does not direct this Court's attention to any evidence in the record that Dr. Rajkotwala ever opined King had any physical functional limitations greater than that set forth in the ALJ's RFC assessment.  Nor does King specifically identify any specific restrictions he believes should have been included in the RFC.

Accordingly, and for all the reasons set forth above, this argument is without merit.

### Dr. Arora

With regard to Dr. Arora, King argues, summarily and without explanation, that "Dr. Arora wrote a letter stating that the claimant was disabled that was not considered by the Administrative Law Judge."  (Doc. No. 9 at 18.)

This letter, dated April 3, 2014, provides as follows:

To Whom it may Concern:

I am writing in regards to Mark King concerning his health and disability status.  Mark is known to me and my practice for several years.  He has been

---

[8] The ALJ's RFC contained the following mental limitations: "He can do simple routine tasks up to SVP 3 level.  The tasks should be low stress, involving no high production or piece rate work or work involving arbitration, confrontation, negotiation, supervision or commercial driving."  (Tr. 16.)

seeing Dr. Brightman, a neurologist, and Dr. Y. Reddy, a pain specialist, for
multiple medical problems.  He is experiencing neck and right shoulder pain,
and he has a C5-6 greater than C4-5 disc osteophyte complex with
spondylosis without myelopathy at the current time.  He has tried epidural
injections but did not help.  I feel it is my medical recommendation that Mark
be put on disability.  Any questions or concerns please feel free to contact my
office.

(Tr. 568.)

The ALJ did not err in failing to address Dr. Arora's April 2014 letter.  It is undisputed

King is seeking POD and DIB and, therefore, the relevant time period is between his August 3,

2003 onset date and his March 31, 2007 DLI.  (Tr. 12.)  King makes no reasoned argument that

Dr. Arora's April 2014 letter relates to his limitations during this time period.  In fact, a review

of the record indicates the contrary.  In the letter itself, Dr. Arora specifically refers to King's

"current" status, meaning as of April 2014.  Moreover, King does not challenge the

Commissioner's assertion that Dr. Arora's opinion rests, in part, on King's treatment with Drs.

Reddy and Brightman, neither of whom appear to have begun treating King until 2010.   (Tr.

363- 364, 413-414.)  In sum, King points to nothing in nothing in Dr. Arora's letter that suggests

his opinion was based on medical evidence dating from the relevant time period.

The Sixth Circuit has explained that "[e]vidence of disability obtained after the

expiration of insured status is generally of little probative value."  *Strong v. Soc. Sec. Admin*., 88

Fed. Appx. 841, 845 (6th Cir .2004)*.  See also Kingery v. Comm'r of Soc. Sec.,* 142 F. Supp.3d

598, 602 (S.D. Ohio 2015); *Barhouma v. Astrue*, 2010 WL 2044952 at * 8 (N.D. Ohio May 24,

2010.)  "A treating physician's opinion rendered after the DLI 'may be considered to the extent it

illuminates [Plaintiff's] health before the expiration of [her] insured status.'" *Stark v. Comm'r of*

*Soc. Sec*., 2016 WL 1077100 at * 6 (N.D. Ohio March 18, 2016) (quoting *Nagle v. Comm'r of*

*Soc. Sec.*, 191 F.3d 452 (6th Cir. 1999)). However to be given significant weight, this retrospective opinion must be supported by relevant, objective evidence that was contemporaneous to the insured period. *See Strong*, 88 Fed. Appx. at 845; *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 287 (6th Cir. 1994); 20 C.F.R. § 404.1527(d)(2)-(3).

As discussed above, King has not demonstrated that Dr. Arora's letter has any relevance to his physical functional limitations prior to his March 2007 date last insured. He has not directed this Court's attention to any evidence that Dr. Arora's opinion relates to his health or limitations during the relevant time period or is supported by relevant, objective evidence contemporaneous to the insured period. Under the circumstances presented, the ALJ did not commit reversible err in failing to address Dr. Arora's April 2014 letter.[9]

Accordingly, this assignment of error is without merit.

**RFC**

King next argues the ALJ's RFC was not based on substantial evidence. (Doc. No. 9 at 16.) He argues remand is required because "the ALJ did not cite to any medical opinions from any examining physicians" supporting his finding that King can perform medium work. (*Id.*) He then asserts the ALJ erred in his evaluation of the opinions of Drs. Rajkotwala and Arora.

---

[9] The Court also notes that Dr. Arora does not opine King has any specific physical functional limitations in his letter. Rather, he states only that "it is my medical recommendation that Mark be put on disability." (Tr. 568.) However, a finding that an individual is "disabled" or "unable to work," is an administrative finding reserved to the Commissioner. 20 C.F.R. § 404.1527(e); *see Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004); *see also Stiltner v. Comm'r of Soc. Sec.*, 244 Fed. Appx. 685, 689 (6th Cir. 2007) ("As an initial matter, we note that the determination of disability is ultimately the prerogative of the Commissioner, not the treating physician."). An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R. § 416.927(d)(3).

(*Id*.)  Finally, King maintains the ALJ mischaracterized the record when he found King was able to care for a grandchild, ride a motorcyle, attend school, and "had never been able to hold on to a job."  (*Id*. at 16-17.)

The Commissioner argues the ALJ was not required to rely on an examining physician's opinion to support his RFC assessment.  (Doc. No. 11 at 10.)  She asserts the RFC was reasonable, noting "although Plaintiff later developed more serious cervical spine issues after his date last insured, there was no evidence these issues existed during the relevant period." (*Id*. at 11.)  In particular, the Commissioner notes King's elbow pain improved after his 2004 surgery, he was instructed to avoid only "heavy activity," and he did not return for further treatment.  (*Id*.)  The Commissioner also emphasizes that Dr. Rajkotwala opined King had "no physical limitations" during the relevant time period, and state agency physician Dr. Pylaeva found King could perform medium work prior to March 2007.  (*Id*. at 12.)  Finally, the Commissioner argues the ALJ reasonably summarized King's reported activities during the relevant period.  (*Id*. at 12-14.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations.  *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R.§ 416.927(d)(2).  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R.§ 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(C), and must consider all of a claimant's medically determinable impairments, both individually and in combination, S.S.R. 96-8p.

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer v. Astrue*, 774 F. Supp.2d 875, 880 (N.D. Ohio 2011) (citing *Bryan v. Comm'r of Soc. Sec.*, 383 Fed. Appx. 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also* SSR 96–8p, at *7, 1996 SSR LEXIS 5, *20 ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")).  While the RFC is for the ALJ to determine, however, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

Here, at step four, the ALJ discussed the medical evidence from the relevant time period regarding King's cervical spine impairment, lateral epicondylitis (elbow pain), and bipolar disorder.  (Tr. 16-17.)  The ALJ then found as follows:

> Mr. King suggests that his sleeping problems, neck problems, depression, and migraine headaches prevent him from working and significantly limit his ability to perform activities of daily living.  However, these subjective complaints are not consistent with the medical evidence of record, which established significant limitations, but none that would preclude the range of medium work activities assessed above.

> Mr. King's allegations are also inconsistent with his reporting in medical evidence.  In medical notes Mr. King has reported caring for a grandchild, riding motor cycles, and attending school [Exhibit 1F:10; Exhibit 6F:28; Exhibit 23F:9].  In addition, Mr. King's wife reported that he has never been able to hold onto a job [Exhibit 2F:8].  These activities are not consistent with

33

the alleged impact of his impairments.  Furthermore, when considered in light
of the record as a whole, his ability to perform these activities reflects that the
limiting effects of his impairments do not preclude him from working at the
limited range of medium work assessed above.

I have considered all of Mr. King's impairments, and the record does not
establish that these impairments caused functional limitations in addition to
those assessed above.

(Tr. 17.)  The ALJ formulated the following RFC:

After careful consideration of the entire record, I find that, through the date
last insured, Mr. King had the residual functional capacity to perform medium
work as defined in 20 CFR 404.1567(c).  He can lift and carry 50 pounds
occasionally and 25 pounds frequently.  He can walk and stand six hours each
out of an 8 hour workday.  He can sit six hours out of an 8-hour workday.  He
can occasionally push/pull and constant foot pedal.  He can frequently use a
ramp or stairs, but never a ladder/rope/scaffold.  He can constantly balance,
frequently stoop, kneel, and crouch, but never crawl.  His manipulative, visual
and communication skills are frequent.  He should avoid dangerous machinery
and unprotected heights.  He can do simple routine tasks and tasks up to the
SVP 3 level.  The tasks should be low-stress, involve no high production or
piece rate work or work involving arbitration, confrontation, negotiation,
supervision, or commercial driving.

(Tr. 16.)

The Court finds the RFC is supported by substantial evidence.  As an initial matter, the

Court rejects King's argument the ALJ erred because he "did not cite to medical opinions from

any examining physicians" which supported his RFC assessment.  Courts within this Circuit

have found that, when evaluating the claimant's RFC, the ALJ is not required to base his RFC

findings entirely on a physician's opinion.  *See Rudd v. Comm'r of Soc. Sec.*, 531 Fed. Appx.

719, 728 (6th Cir. 2013) (quoting SSR 96–5p) ("[T]o require the ALJ to base her RFC finding

on a physician's opinion, 'would, in effect, confer upon the treating source the authority to make

the determination or decision about whether an individual is under a disability, and thus would

be an abdication of the Commissioner's statutory responsibility to determine whether an

individual is disabled.' "); *Brogan v. Comm'r of Soc. Sec.*, 2017 WL 1032520 at * 14 (N.D.

Ohio March 16, 2017) ("An RFC determination is not the duty of a claimant's physicians;

instead this determination is exclusively within the purview of the Commissioner."); *Peterson v.*

*Comm'r of Soc. Sec.*, 2017 WL 343625 at * 3 (W.D. Mich. Jan. 24, 2017).  As another Judge

within this district has explained:

> The ALJ, not a physician, is assigned the responsibility of determining a
> claimant's RFC based on the evidence as a whole.  42 U .S.C.A. §
> 423(d)(5)(B); 20 C.F.R. § 416.946(c).  Pursuant to the regulations, the ALJ is
> charged with evaluating several factors in determining the RFC, including the
> medical evidence (not limited to medical opinion testimony), and the
> claimant's testimony.  *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629 633 (6th
> Cir.2004); SSR 96–5p, SSR 96–8p.  The final responsibility for deciding the
> RFC "is reserved to the Commissioner." 20 C.F.R. § 416.927(e)(2).
>
> The Sixth Circuit has repeatedly upheld ALJ decisions where the ALJ rejected
> medical opinion testimony and determined RFC based on objective medical
> evidence and non-medical evidence.  *See, e.g., Ford v. Comm'r of Soc. Sec.*,
> 114 F.App'x 194 (6th Cir. 2004); *Poe v. Comm'r of Soc. Sec.*, 2009 WL
> 2514058, at (6th Cir. Aug.18, 2009). "[A]n ALJ does not improperly assume
> the role of a medical expert by assessing the medical and non-medical
> evidence before rendering a residual functional capacity finding."  *Poe,* 2009
> WL 2514058 at *7.  Although the ALJ discounted the testimony of the
> doctors who proposed widely varying ranges of limitations, and found Ms.
> Henderson to not be fully credible in her testimony as to her limitations and
> abilities, he was within a clearly appropriate "zone of choice" to find that the
> testimony (even if not all fully credible) suggested some limitation was
> appropriate. *See, Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001).

*Henderson v. Comm'r of Soc. Sec.*, 2010 WL 750222 at * 2 (N.D. Ohio March 2, 2010). [10] *See*

---

[10] King does not argue the ALJ erred because he relied on an outdated state agency
physician opinion in formulating the RFC.  In fact, the only state agency physician
opinion regarding King's physical impairments is that of Dr. Pylaeva, who issued her
opinion in January 2013 based on her review of the medical records during the relevant
time period.  (Tr. 61-62.)  King does not argue the records reviewed by Dr. Pylaeva were
incomplete or otherwise object that her opinion is flawed because it failed to take into
account a critical body of objective medical evidence.  *See Kizys v. Comm'r of Soc. Sec.*,
2011 WL 5024866 at * 2 (N.D. Ohio Oct. 21, 2011).

35

*also Peterson*, 2017 WL 343625 at * 3 (W.D. Mich. Jan. 24, 2017); *Thomas v. Comm'r of Soc. Sec.*, 2016 WL 7403743 at * 3 (N.D. Ohio Dec. 22, 2016) ("There is no requirement that the ALJ's RFC finding be based on the medical opinion of a physician.")  Moreover, it is well established that the claimant—and not the ALJ—has the burden to produce evidence in support of a disability claim.  *See, e.g., Wilson v. Comm'r of Soc. Sec.*, 280 Fed. App'x. 456, 459 (6th Cir.2008) (citing 20 C.F.R. § 404.1512(a)).  *See also Peterson v. Comm'r of Soc. Sec.*, 2017 WL 343625 at * 3 (W.D. Mich. Jan. 24, 2017) ("It is not the ALJ's burden to seek out medical opinions to prove or disprove a disability claim.") (citing *Brown v. Comm'r of Soc. Sec.*, 602 Fed. Appx. 328, 331 (6th Cir. 2015)). [11]

Here, the ALJ considered the medical evidence from the relevant time period, including treatment records relating to King's physical and mental impairments.  (Tr. 16-17.) The ALJ acknowledged King's complaints of a stiff neck and headaches, but noted imaging of King's cervical spine in January 2005 showing only mild or minimal narrowing at C4-5 and C5-6.  (*Id.*)  The ALJ also discussed King's elbow pain and diagnosis with lateral epicondylitis in August 2003, culminating in surgery in February 2004.  (*Id.*)  However, the ALJ emphasized King reported mild pain after surgery and was restricted only from heavy activity.  (*Id.*)  While

---

[11] There is only a special, heightened duty requiring the ALJ to develop the record when the plaintiff is "(1) without counsel, (2) incapable of presenting an effective case, and (3) unfamiliar with hearing procedures."  *Wilson,* 280 Fed. App'x. at 459 (citing *Lashley v Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1051–52 (6th Cir.1983)).  King was represented by counsel during the administrative proceedings below and has not asserted or  demonstrated that any of these circumstances are present in the instant case.  Thus, the ALJ had no heightened duty to obtain an examining physician opinion regarding King's functional limitations during the relevant time period.  Indeed, it is not clear that would have even been possible, given that King waited until May 2012 to file his application for POD and DIB for the time period August 2003 to March 2007.

36

the record reflects King reported increased elbow pain at the very end of the insured period (in March 2007), the ALJ noted surgery was not recommended and King was treated with Ibuprofen. (*Id.*) Finally, the ALJ acknowledged King's diagnosis with bipolar disorder in February 2006, but found treatment notes showed overall improvement with medication. (*Id.*)

King does not raise any specific challenge to the above findings, nor does he direct this Court's attention to any particular medical evidence from the relevant time period that would support greater physical or mental restrictions. Upon review, the Court finds the RFC is supported by substantial evidence. As the ALJ correctly noted, in the weeks and months after his elbow surgery in February 2004, King reported significant improvement in his elbow pain. In March 2004, King reported "doing very well and just having a slight amount of pain." (Tr. 268.) In April of that year, King reported "just occasionally ha[ving] some discomfort" and was found to have full range of motion in his elbow. (Tr. 633.) In June 2004, King reported some pain with "heavy activity," but examination revealed full range of motion and no instability and King was advised only to avoid "heavy aggravating type of activity." (Tr. 634.) The record reflects King did not seek further treatment for his elbow pain until nearly three years later, in March 2007. (Tr. 639-641.) At that time, King was diagnosed with elbow pain, prescribed ibuprofen, and referred to Aaron Fritz, D.O. (*Id.*) In April 2007 (after King's DLI), Dr. Fritz found full range of motion in King's elbows and no instability or motor/sensory deficits. (Tr. 384-385.) Dr. Fritz advised King to continue with ibuprofen. (*Id.*)

With regard to King's cervical pain, the record reflects King first reported neck pain and headaches in January 2005. (Tr. 207-209.) As the ALJ correctly noted, imaging of King's cervical spine reflected, at most, mild or minimal narrowing at C4-C5 and C5-C6. (Tr. 204-

37

205.)  King points to no other evidence relating to his cervical impairment indicating a worsening of this condition during the insured period.

In his Statement of Facts, King cites extensively to treatment notes post-dating his DLI showing complaints of increased neck, back and elbow pain.  King has not, however, either argued or demonstrated these treatment notes relate back to his limitations during the insured period.  *See  Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir.1988) (noting that evidence of a medical condition diagnosed after the date last insured was only "minimally probative" of claimant's condition during the insured period); *Turski v. Comm'r of Soc. Sec.,* 2012 WL 3020027 at * 13 (E.D. Mich. May 17, 2012) ("[E]vidence of a claimant's post-DLI condition, to the extent that it relates back, is relevant only if it is reflective of a claimant's limitations prior to the date last insured, rather than merely his impairments or condition prior to that date."); *Barhouma*, 2010 WL 2044952 at * 7 (same.)  At best, the post-DLI evidence cited by King suggests his cervical stenosis (which was diagnosed in 2010) may have been the root cause of his arm pain/weakness and migraines.  (Doc. No. 9 at 3.)  Whether or not this is the case, King has not meaningfully argued or shown that the post-DLI evidence cited in the Fact Section of his Brief is "reflective of [his] limitations prior the date last insured, rather than merely his impairments or condition prior to this date."  *Barhouma*, 2010 WL 2044952 at * 7.

Lastly, the Court rejects King's argument that the ALJ mischaracterized his daily activities and work history.  In formulating the RFC, the ALJ noted that "Mr. King has reported caring for a grandchild, riding motor cycles, and attending school."  (Tr. 17.)  He also noted King's wife's statement that "he has never been able to hold onto a job."  (*Id*.)  King argues this is an unfair characterization of the record because (1) it was King's wife that

38

carried the baby, changed his diapers, and performed "all substantial care duties;" (2) King was not riding an "actual motorcycle" but, instead, was sitting on a child's motor bike when he fell off; and (3) King attended college classes but had to drop out due to his medical conditions. King also argues the ALJ improperly relied on a treatment note indicating King's wife said he "has never been able to hold down a job," because King's wife did not really mean that and her statement "was improperly summarized within the doctor notes." (Doc. No. 9 at 17.)

King's arguments are without merit. The only evidence King cites in support of his contention that his wife took care of their grandchild, is a letter from King's attorney to the Appeals Council after the ALJ decision was issued. (Doc. No. 9 at 16-17, citing Tr. 199-200.) King also relies on his attorney's letter for his argument that the treatment note indicating King "has never been able to hold a job," was an "improper summary within the doctor notes." (*Id.*) As the Appeals Council denied review, however, this Court's review is limited to the record and evidence before the ALJ.[12]  *See Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 838 (6th Cir. 2016); *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir.2001); *Walker v. Barnhart*, 258 F.Supp.2d 693, 697 (E.D. Mich.2003); *Fink v. Comm'r of Soc. Sec.*, 2013 WL 3336579 at fn 5 (N.D. Ohio June 25, 2013). King's attorney's letter to the Appeals Council, therefore, is of no relevance to the instant appeal because it was not before the ALJ at the time he rendered his decision. Moreover, as the Commissioner correctly notes, King's attorney's letter is argument, not evidence.

---

[12] A district court can only consider evidence submitted to the Appeals Council in order to assess whether remand under sentence six of 42 U.S.C. § 405(g) may be appropriate. *Cox v. Comm'r of Soc. Sec.*, 615 Fed. Appx. 254, 261-262 (6th Cir. June 11, 2015). King, however, has not requested a sentence six remand.

Finally, with regard to the ALJ's statement that King was caring for a grandchild, riding motorcycles, attending school, and "couldn't hold down a job," the Court finds any error in these findings to be harmless.  King points to nothing in the record to suggest these findings render the RFC unsupported by substantial evidence.  As noted at length above, the ALJ discussed the medical and opinion evidence regarding King's impairments and found "the record does not establish that these impairments caused functional limitations in addition to those assessed above."  (Tr. 17.)  King has not directed this Court's attention to any treating physician opinion from the relevant time period that would support greater restrictions and, in fact, Dr. Rajkotwala expressly found "no physical limitation."  (Tr. 237-238.)  Moreover, while not cited by the ALJ, the RFC is consistent with (if not more restrictive than) the opinion of state agency physician Dr. Pylaeva, who opined King could perform medium work during the insured period.  (Tr. 61-62.)  King cites no specific evidence to support a more restrictive RFC, nor does he identify any particular limitations that he believes should have been included in the ALJ's RFC assessment.

Accordingly, and for all the reasons set forth above, the Court finds the ALJ's RFC is supported by substantial evidence.  King's argument to the contrary is without merit.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

> *s/ Jonathan D. Greenberg*
> Jonathan D. Greenberg
> United States Magistrate Judge

Date: March 23, 2017

**<u>OBJECTIONS</u>**

     Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  <u>28 U.S.C. § 636(b)(1).</u> Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See* <u>*United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).</u>